[942 NYS2d 93]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAURICE NEWMAN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FREDDIE WILSON, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RODGER WILSON, Appellant.

First Department, April 17, 2012

**APPEARANCES OF COUNSEL**

*Robert S. Dean, Center of Appellate Litigation,* New York City (*Jody Ratner* of counsel), for Maurice Newman, appellant.

*Steven Banks, The Legal Aid Society,* New York City (*Paul Wiener* of counsel), for Freddie Wilson, appellant.

*Office of the Appellate Defender,* New York City (*Richard M. Greenberg* of counsel), and *Paul, Hastings LLP,* New York City (*Joshua M. Bennett, Kenneth M. Breen* and *Douglas I. Koff* of counsel), for Rodger Wilson, appellant.

*Cyrus R. Vance, Jr., District Attorney,* New York City (*Grace Vee* and *Susan Gliner* of counsel), for respondent.

**OPINION OF THE COURT**

Acosta, J.

This case addresses the kind of showing that must be made to justify a limited intrusion into a vehicle whose occupants have been removed and patted down. Applying the search and seizure provisions of the New York Constitution (NY Const, art I, § 12), we hold that the police action at issue in this case was proper.

We believe that defendant Newman's deception in conjunction with his rather disconcerting movements understandably triggered the officers' concerns that there could be a weapon in the car, which posed an "actual and specific danger." Having sufficient reason to fear for their safety, the officers were thus permitted to make a limited intrusion to verify whether there were weapons in the car.

Background

On December 19, 2007, Police Officers Gabriel Diaz and Kwane Kipp, and Sergeant Stephan O'Hagan, were on patrol in an unmarked vehicle. At approximately 10:25 P.M., as they approached the intersection of Columbia Street and Houston Street, they saw a white, four-door Ford Contour in front of them. The name of the state on the rear license plate was covered by the bottom of the license plate holder and was not visible. Since an "obstructed" license plate is a violation of the Vehicle and Traffic Law, the vehicle was pulled over.

Diaz, Kipp and O'Hagan got out of their car and approached the Contour, noticing that the car contained a driver, a front seat passenger and another passenger in the back, behind the front passenger seat. Meanwhile, Officer Jensen Dayle and Lieutenant Derrico saw Diaz stop the Contour, and pulled up in their unmarked car behind Diaz's vehicle.

As Officer Diaz walked toward the car, he saw the occupants of the car "moving a lot" as they "bent down putting something down and picking something up." Officer Kipp noticed all three individuals "moving around in their seats," "ducking down," "moving their head[s] up and down" and "looking down." Kipp believed that "[s]omething was going on," so he warned Diaz and O'Hagan to "[b]e careful, they're moving around." None of the officers had their guns drawn.

Officer Diaz approached the driver's side window and asked defendant Rodger Wilson for his license, registration and insurance card. Rodger[1] immediately told the officer that he did not have a driver's license. When Diaz asked Rodger where he was going, Rodger replied that he was lost, and was looking for a highway to head back to Cleveland, Ohio. The car had Ohio license plates, and defendant Maurice Newman, who was pretending to be asleep, was holding a map. Rodger told the officer that the car belonged to Newman, but he was tired, which

---

1. The two defendants named Wilson will be referred to by their first name.

was why Rodger was driving. Diaz observed that even though Newman had his eyes closed and "acted like he was sleeping," he had been moving before they approached the car.

When Officer Diaz asked Rodger for the paperwork for the car, Rodger tapped Newman on the shoulder "like he was waking Mr. Newman up" and asked for the papers. Newman immediately reacted and opened the glove compartment but closed it right away without looking inside. Two to three seconds later, Newman leaned over the center console and reached under the driver's seat as if he was looking for something. Newman then sat in his seat again, leaned forward and reached under his seat with one hand. At that point, Diaz "did not feel comfortable" and feared for his safety; he thought that Newman "might be reaching for a weapon or something." Officer Diaz ordered Newman to stop, and Newman complied, putting his hands on his lap. Officer Diaz then ordered Rodger, a "pretty big guy," to step out of the car. After Diaz gave Rodger a quick pat down and found no weapons or contraband, he instructed Rodger to walk to the back of the car. Officer Kipp then removed defendant Freddie Wilson from the rear passenger seat and, because of the "movements" he had observed, frisked him for weapons, and then brought him to the back of the car. Sergeant O'Hagan instructed Officer Dayle to take Newman out of the car. Dayle conducted a safety pat down of Newman, and escorted him to the back of the car. There, Officer Kipp and Lieutenant Derrico watched the three men.

Officer Diaz subsequently leaned inside the Contour through the open door on the driver's side. With the upper part of his body positioned between the steering wheel and the center console, he shined his flashlight under the front passenger seat and the driver's seat, the areas that Newman had been "making a movement towards," to find out "what he was looking for under the seat." Officer Diaz then saw the handle of a gun sticking out about three inches from under the front passenger seat. Diaz alerted the officers on his team that there was a firearm in the car. After that, Newman, Rodger and Freddie were arrested. Officer Diaz did not issue a ticket for a traffic violation or for Rodger driving without a license. Upon "completely" searching the car, Diaz recovered a loaded .25 caliber handgun from under the front passenger seat—the one he had seen sticking out, plus a loaded 9 millimeter handgun and an imitation pistol.

Officer Diaz drove the Ford Contour to the station house, where he searched the remainder of the car. From the rear pas-

senger seat, he recovered metal handcuffs, 10 plastic handcuff ties, two rounds of 9 millimeter ammunition, a blue jacket containing an extra 9 millimeter round, gloves, a wool hat and a ski mask. An additional ski mask was recovered from between the front passenger seat and the center console. Officer Kipp and Sergeant O'Hagan transported Freddie to the station house in their New York City Police Department vehicle, which Kipp had checked before going out that evening, as "standard procedure," to make sure there was no contraband or other items left behind from a previous shift. Kipp informed Freddie that since the back of the car was "clean," if anything was found, Kipp would know that Freddie had put it there. Kipp sat in the back seat with Freddie, who was handcuffed from behind. When they arrived at the precinct, Kipp checked the back seat and found seven credit cards and an identification card, all belonging to another person, directly under where Freddie had been sitting. From Freddie's wallet, Officer Kipp recovered four credit cards with the name James Carson III.

The hearing court denied defendants' motions to suppress the contraband found in the vehicle. The court held that the stop of defendants' vehicle was lawful because the name of the state was obscured on the license plate, a violation of the Vehicle and Traffic Law. Once the car was lawfully stopped, the court concluded, the police had the right to direct the driver and passengers to exit the car, out of concern for their safety, even without a particularized reason for believing that the driver or passengers possessed a weapon. Lastly, the court concluded that Officer Diaz had acted reasonably and lawfully in searching under the passenger seat because Officers Diaz and Kipp each independently observed movements of ducking down and reaching under the seats, which "heightened their suspicion," and defendant Newman's behavior was suspicious. The court concluded that, based upon "these facts and given the totality of the circumstances, there was a sufficient predicate for Officer Diaz's limited intrusion into the car, which was appropriately circumscribed to the specific area where he had just seen Defendant Newman reaching."

On the second day of trial, Newman's counsel, joined by counsel for the other defendants, moved to reopen the suppression hearing, or in the alternative, requested that the hearing court reconsider its decision, in light of *Arizona v Gant* (556 US 332 [2009]). The trial court distinguished *Gant*, and opined that while *Gant* may have changed federal law to some extent, it did

not alter New York law. The trial court, however, invited defendants to reargue the issue before the suppression court. Later that afternoon, the trial court advised the parties that it had received the hearing court's written decision, where it stated that it had considered defendants' motion in light of *Gant*, but adhered to its previous ruling and denied the application to reopen the suppression hearing. Defendants were convicted, after a jury trial, of various crimes on the basis of the evidence obtained through the officers' search of the vehicle. Defendants now appeal from that judgment.

Analysis

■ As a threshold matter, the officers were legally entitled to stop defendants' vehicle because it was being operated with an obstructed license plate (*see People v Brooks*, 23 AD3d 847 [2005], *lv denied* 6 NY3d 810 [2006]; *see also* Vehicle and Traffic Law § 402 [1]). It was also proper for the officers to direct the driver and passengers to exit the vehicle (*see People v Carvey*, 89 NY2d 707, 710 [1997]; *People v Garcia*, 85 AD3d 28, 31 [2011], *lv granted* 18 NY3d 883 [2012]). The primary issue before us is whether "once defendant and the other occupants had been removed from the automobile, the police could lawfully commit the greater intrusion of reaching into the vehicle" (*People v Carvey*, 89 NY2d at 710).

■ Defendants contend that the evidence gathered in this case should be suppressed because of the Supreme Court's recent decision in *Arizona v Gant* (556 US 332 [2009]). In that case, the Supreme Court announced a "shift in [its] Fourth Amendment jurisprudence on searches of automobiles incident to arrests of recent occupants" (*Davis v United States*, 564 US —, 131 S Ct 2419, 2424 [2011]). Specifically, the Court

> "adopted [in *Gant*] a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest" (*Davis* at 2425 [internal quotation marks omitted]).

However, because *Gant* only applies to searches incident to arrest (*see United States v McGregor*, 650 F3d 813, 825 n 5 [1st Cir 2011]; *United States v Vinton*, 594 F3d 14, 24 n 3 [DC Cir 2010], *cert denied* 562 US —, 131 S Ct 93 [2010]; *United States v Griffin*, 589 F3d 148, 154 n 8 [4th Cir 2009]; *United States v*

*Torres*, 2011 WL 2209144, *6-8, 2011 US Dist Lexis 61330, *19-24 [SD NY 2011]), we consider *Gant* to be inapposite since the search at issue here was not conducted incident to arrest (indeed, it was the officers' search of defendant's car in this case that precipitated the arrest). Because the protections available to defendants under our state constitution are far more robust than those available under the federal constitution (*compare People v Torres*, 74 NY2d 224 [1989], *with Michigan v Long*, 463 US 1032 [1983]), however, we begin our analysis by considering the propriety of the police search in this case under our state's law.

Any search and seizure case involving a vehicle stop requires the balancing of two important considerations: (1) the motorist's important privacy interest in his or her vehicle (*see People v Weaver*, 12 NY3d 433, 444 [2009] ["the use of a vehicle upon a public way does not effect a complete surrender of any objectively reasonable, socially acceptable privacy expectation"]) and (2) the inordinate risk that police officers face during a stop (*see People v Anderson*, 17 AD3d 166, 168 [2005], citing *Pennsylvania v Mimms*, 434 US 106 [1977]). In balancing both of those considerations, the Court of Appeals has long recognized that "[a] police officer acting on [1] *reasonable suspicion* that criminal activity is afoot and [2] on an articulable basis to fear for his own safety may intrude upon the person or personal effects of the suspect only to the extent that is actually necessary to protect himself from harm" (*People v Carvey*, 89 NY2d 707, 710 [1997] [emphasis added], quoting *People v Torres*, 74 NY2d at 226). Since "[a] police officer's entry into a citizen's automobile and his inspection of personal effects located within are significant encroachments upon that citizen's privacy interests," however, such an intrusion must be "reasonably related in scope and intensity to the circumstances which rendered [its] initiation permissible" (*Torres*, 74 NY2d at 229-230 [citations omitted]; *Anderson*, 17 AD3d at 167 ["(I)t is well settled that any inquiry into the propriety of police conduct must weigh the degree of intrusion which it entails against the precipitating and attending circumstances out of which the encounter arose"]).

■ Where a vehicle's occupants have been "removed and patted down without incident [such that] any immediate threat to [the officer's] safety [has been] eliminated," it is generally unlawful for the officer—in the absence of probable cause—to "invade the interior of a stopped car" (*see People v Carvey*, 89 NY2d 707, 710 [1997], citing *Torres*, 74 NY2d at 226). However,

if information gathered during a stop reveals that (1) there is a substantial likelihood of a weapon being present in the vehicle which (2) poses an "actual and specific danger" to the officer's safety, the officer would be justified in engaging in a limited intrusion into the suspect's vehicle—"notwithstanding the suspect's inability to gain immediate access to that weapon" (*Carvey*, 89 NY2d at 710-711).

When considering whether any further intrusion into a stopped vehicle whose occupants have been removed from the vehicle and frisked is warranted, an officer must have more than "reasonable suspicion" (*id.* at 711). That is to say, "[t]he requisite knowledge must be more than subjective; it should have at least some demonstrable roots. Mere 'hunch' or 'gut reaction' will not do" (*People v May*, 52 AD3d 147, 151 [2008], quoting *People v Sobotker*, 43 NY2d 559, 564 [1978]; *cf People v Hackett*, 47 AD3d 1122, 1124 [2008] [requiring the presence of "*objective indicators* which could lead to a reasonable conclusion that there was a substantial likelihood that a weapon was located in defendant's vehicle"]). Consequently, conclusory assertions by police officers that a car's occupants have engaged in "furtive" behavior (*cf. Garcia*, 85 AD3d at 32-33) or caused them apprehension (*cf. People v Howard*, 147 AD2d 177 [1989], *appeal dismissed* 74 NY2d 943 [1989]), cannot validate further intrusions into the interior of a vehicle.

In ascertaining whether an officer has the requisite "reasonable suspicion" to intrude into a stopped vehicle whose occupants have been removed and frisked, "[t]he court's focus must center on whether the police conduct was reasonable in view of the totality of the circumstances, for reasonableness is the touchstone by which police-citizen encounters are measured" (*People v Anderson*, 17 AD3d 166, 167-168 [2005] [citations omitted]). While each case presents unique facts, we note that every Department has found that the combination of (1) movements within a car suggesting that the defendant was reaching for something that might be a weapon and (2) *some other suggestive factor(s)* was sufficient to justify the limited intrusion of searching the area where a defendant's movements took place (*see e.g. People v Ashley*, 45 AD3d 987 [3d Dept 2007], *lv denied* 10 NY3d 761 [2008]; *People v Jones*, 39 AD3d 1169 [4th Dept 2007]; *People v Hutchinson*, 22 AD3d 681 [2d Dept 2005]; *People v Shabazz*, 301 AD2d 412 [1st Dept 2003], *lv denied* 100 NY2d 566 [2003]; *People v Worthy*, 261 AD2d 277 [1st Dept 1999], *lv denied* 93 NY2d 1029 [1999]). Such a combination is present in this case.

■ Here, the movements observed by the officers as they approached the car suggested that defendants could have been searching for something underneath their seats. While those movements alone would not justify a police intrusion into the vehicle,[2] the presence of additional factors justified the officers' reasonable suspicion that there could be a weapon in the vehicle that posed an "actual and specific danger." First, despite the fact that the officers initially observed everyone in the stopped vehicle moving around, defendant Newman pretended to be asleep when the officers reached the vehicle. Second, when asked to search for the vehicle's registration (by one of his codefendants), defendant Newman attempted to reach underneath his seat after perfunctorily opening and closing the glove compartment. Based on Newman's suspiciously reaching under his seat, purportedly to search for paperwork, after trying to deceive the officers by feigning sleep, the officers had ample reason to believe that (1) there was a substantial likelihood that he had a weapon underneath his seat that (2) posed an actual and specific danger to their safety. Based on the totality of the circumstances, the police were justified in conducting a limited search of the area where they saw Newman reaching (see People v Mundo, 99 NY2d 55, 59 [2002], citing Carvey, 89 NY2d at 712). Since defendants are not entitled to have the evidence obtained against them by the police officers suppressed under our more protective state constitution, we need not address their federal claim for relief. We have considered defendants' remaining contentions and find them unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Charles H. Solomon, J., at suppression hearing; Daniel P. FitzGerald, J., at jury trial and sentencing), rendered June 12, 2009, as amended June 24, 2009, convicting defendant Newman of criminal possession of a weapon in the second degree (two counts), attempted criminal possession of a weapon in the second degree (two counts) and possession of an imitation pistol, and sentencing him to an aggregate term of 10 years, should be affirmed. The judgment of the same court and Justices, rendered

2. Such movements may have simply reflected nervousness on the part of the individuals in the car—something that is not at all uncommon even when the most law-abiding individual encounters a police officer. Mere nervousness, however, cannot provide an officer with the kind of reasonable suspicion that is required to intrude into an individual's vehicle (see People v Hackett, 47 AD3d 1122, 1124 [2008] [While "defendant seemed nervous and repeatedly looked at his vehicle, this conduct, in and of itself, is insufficient to justify a search"]).

June 12, 2009, convicting defendant Freddie Wilson of criminal possession of a weapon in the second degree (two counts), attempted criminal possession of a weapon in the second degree (two counts), possession of an imitation pistol, criminal possession of stolen property in the fourth degree (11 counts) and criminal possession of stolen property in the fifth degree, and sentencing him to an aggregate term of 15 years, should be affirmed. The judgment of the same court and Justices, rendered June 12, 2009, convicting defendant Rodger Wilson of criminal possession of a weapon in the second degree (two counts), attempted criminal possession of a weapon in the second degree (two counts) and possession of an imitation pistol, and sentencing him to an aggregate term of 10 years, should be affirmed.

Tom, J.P., Sweeny, Renwick and Román, JJ., concur with Acosta, J.

Judgment, Supreme Court, New York County, rendered June 12, 2009, as amended June 24, 2009, affirmed. Judgment, same court and Justices, rendered June 12, 2009, affirmed. Judgment, same court and Justices, rendered June 12, 2009, affirmed.