(October 27, 2016)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GREGORY LEE, Appellant. [40 NYS3d 80]—

Judgment, Supreme Court, New York County (Melissa C. Jackson, J., at suppression hearing; Jill Konviser, J., at plea and sentencing), rendered August 7, 2013, convicting defendant of forgery in the second degree (six counts), identity theft in the first degree (six counts), criminal possession of a forged instrument in the second degree (two counts), criminal possession of stolen property in the fourth degree (eight counts), and identity theft in the third degree (seven counts), and sentencing him, as a second felony offender, to an aggregate term of 3 to 6 years, affirmed.

The testimony at the suppression hearing, which was credited by the hearing court, established that the police had probable cause to arrest defendant for unlawful possession of marijuana. The police witnesses testified that there was a strong odor of marijuana emanating from defendant's car when defendant opened the car door, and the officers observed a partially burned marijuana cigarette, in plain view, on the center console between the front seats of the car (see People v Singleton, 139 AD3d 208, 215 [1st Dept 2016]; People v Smith, 66 AD3d 514 [1st Dept 2009], lv denied 13 NY3d 942 [2010]). Defendant argues that the police testimony was incredible, particularly because the officers already were planning to arrest him for crimes involving possession of stolen property. Generally, credibility determinations are left to the hearing court, and the findings of fact by the hearing court are entitled to great deference on appeal (People v Prochilo, 41 NY2d 759, 761 [1977]; People v Edwards, 250 AD2d 442, 442-443 [1st Dept 1998], lv denied 92 NY2d 896 [1998]). Here, we see no reason to disturb the credibility finding of the hearing court. It is not implausible that the officers would find a partially burnt marijuana cigarette in defendant's car, and the record contains no basis to conclude that the officers manufactured this testimony.[1]

The critical issue in this case is whether the officers' search of the car, which was conducted back at the police district headquarters and not at the arrest location, was a legitimate inventory search. We conclude that it was.[2] The People introduced a copy of the relevant patrol guide section outlining

---

1. We need not decide whether the evidence adduced at the hearing, including the copy of the wanted poster for subway related larcenies, was sufficient to provide the arresting officer with probable cause independent of the observation of the marijuana cigarette.

2. Although the dissent focuses on the officers' motivation in following defendant, this background information does not establish whether the officers

the procedures for inventory searches. Everything was removed from the car, under the direction of a sergeant, and even items such as nail clippers were vouchered. A contemporaneous list was made of the items that were removed, and the list was introduced at the hearing. Copies of property clerk invoices also were admitted in evidence at the hearing. The testimony at the hearing established that the officers did not exercise discretion in removing items from the car, and that the search was not a ruse to recover incriminating evidence[3] (see People v Padilla, 21 NY3d 268 [2013], cert denied 571 US —, 134 S Ct 325 [2013]).

Contrary to the argument of the dissent, the police complied with the third requirement of the New York Police Department (NYPD) Patrol Guide's inventory search guidelines. This section requires the officers to remove all valuables from the vehicle and voucher them on a "PROPERTY CLERK INVOICE" (NYPD Patrol Guide Procedure No. 218-13 [3]). The officers testified at the hearing that as the items were removed, they documented what was taken out of the car. This is one of the hallmarks of an inventory search. The fact that it was not on an "inventory" form does not undermine the evidentiary value of the list, nor alter the conclusion that the procedures employed effectively limited the discretion of the officers conducting the search (see People v Black, 250 AD2d 494 [1st Dept 1998], lv denied 92 NY2d 922 [1998]). Moreover, the Patrol Guide directs that valuables be listed on a property clerk invoice, and those invoices are in the hearing record.

The hearing court heard the testimony and determined that the search was lawful. There is nothing in the record that would support overturning that determination (see Padilla at 272). The minor discrepancies between the handwritten list and the property clerk invoices do not call into question the credibility of the officers who testified at the hearing (see id. at 272-273 ["The fact that the officer did not follow written police procedure when he gave some of the contents of the vehicle to defendant's sister without itemizing that property, did not invalidate the search"]; see also People v Walker, 20 NY3d 122,

had probable cause to arrest defendant when he was actually detained (see generally People v Wright, 98 NY2d 657, 658-659 [2002], citing People v Robinson, 97 NY2d 341, 349 [2001] [stating that "[i]n making that determination of probable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant"]).

3. In light of our holding that this was a valid inventory search, we need not discuss the People's alternative argument that the officers had a right to search the car for narcotics or for stolen property.

126-127 [2012] [upholding an inventory search despite several deficiencies in the form and descriptions of items]; *Black* at 494, citing *People v Salazar*, 225 AD2d 804, 805 [2d Dept 1996], *lv denied* 88 NY2d 969 [1996]).

The dissent cites *People v Galak* (80 NY2d 715, 720-721 [1993]) to show that an inventory list created five hours after the search renders the list invalid and prevents a finding of a valid inventory search. However, in the instant case, the handwritten inventory list was made at the same time the items were removed and the procedure created a usable inventory. *Galak* is distinguishable because the list was created five hours after the search, while here, the record contains no information about when the typewritten property clerk invoices were created as opposed to when they were printed.

The officers' decision to delay defendant's arrest until he had opened his car is not evidence that the arrest was merely a pretext to search the car. As explained above, when defendant returned to his car and opened the door, the officers smelled marijuana and noticed a marijuana cigarette, establishing probable cause to arrest defendant for unlawful possession of marijuana. It is important to note that both defendant, and the woman who was with him, were arrested, and therefore no one was available, except the police, to take possession of the car. The officer who conducted the search initially testified that it was "an inventory search," and that the purpose was "to safeguard all the property in the vehicle." In addition, the sergeant explained that there was an inventory search, and that they took anything of value out of the car. Although he also referred to it as a search for evidence, the procedures that were followed were more consistent with an inventory search than anything else, and support the hearing court's conclusion in this case. An inventory search is not invalid merely because incriminating evidence is recovered so long as that was not the primary purpose of the search (*see People v Johnson*, 1 NY3d 252, 256 [2003]). Concur—Tom, J.P., Friedman, Richter and Kapnick, JJ.

Gesmer, J., dissents in a memorandum as follows: I respectfully dissent.

The motion court should have granted defendant's motion to suppress the physical evidence recovered during the warrantless search of defendant's car. The motion court's conclusion that the police conducted a valid inventory search is inconsistent with both the police testimony that their motivation for the search was investigatory, and the documentary and testimonial evidence that the search did not comply with established

procedure. In addition, the evidence failed to provide any reasonable alternative basis for the warrantless search of defendant's car at the time of his arrest.

The legality of the search on November 16, 2012 can only be evaluated by taking into account the events before that date. The relevant events began in June 2012, when NYPD Sergeant Jimmy Freyre, who worked for the Transit Manhattan Intelligence Division, read a report alleging that a grand larceny had taken place on June 10, 2012 at the 42nd Street and Eighth Avenue subway station. Although Sergeant Freyre was not assigned to the case—indeed, his duties did not include crime investigation—he decided to conduct his own investigation of the June 10 incident. He found a surveillance video for that date, which showed an individual taking a wallet from someone in the subway station. Sergeant Freyre then looked through what he described as "a book of known grand larceny, pickpocket recidivists" that contained mug shots of individuals, including one of defendant Gregory Lee. Sergeant Freyre concluded that the individual from the surveillance video matched defendant's mug shot.[1]

On October 25, 2012, the police arrested defendant and another individual at the Union Square subway station for attempting to commit grand larceny. Incident to the arrest, the police recovered a MetroCard on defendant's person. Sergeant Freyre was called to debrief defendant after the arrest, but defendant refused to speak to him.

The events following defendant's October arrest are not entirely clear. Sergeant Freyre testified that he was aware that defendant's October arrest led to a criminal proceeding, although Sergeant Freyre did not know how the proceeding concluded or whether defendant had been released. After the police released defendant for attempted grand larceny, Sergeant Freyre decided to conduct his own investigations of the circumstances surrounding the purchase of the MetroCard recovered during defendant's October arrest, even though he was not assigned to the case.[2]

As part of his investigation, Sergeant Freyre ran the MetroCard through the transit special investigations unit. Sergeant Freyre testified that he spoke to "a detective," who

1. Sergeant Freyre testified that defendant was arrested on June 19, 2012 for the incident that occurred on June 10, 2012. However, it is unclear from the record if defendant's June 19 arrest was a result of Sergeant Freyre's investigation and with what offenses, if any, defendant was charged.

2. It is unclear why the police were still in possession of the MetroCard after defendant had been released.

told him that he was already aware that the MetroCard had been purchased with a stolen credit card.[3] Nevertheless, Sergeant Freyre moved forward with his own investigation, although he did not complete any formal reports. Sergeant Freyre informed Detective Larson, the assigned case detective, that defendant was in possession of a MetroCard purchased with a stolen credit card at the time of defendant's October arrest. Together, they recovered and watched a surveillance video that showed an individual, whom Sergeant Freyre identified as defendant, buying a MetroCard at a subway vending machine with a credit card.[4] Sergeant Freyre then created a "wanted" poster for defendant, seeking his arrest for criminal possession of stolen property, based on his possession of the MetroCard that was allegedly purchased with a stolen credit card.

On November 13, 2012, Sergeant Freyre was on patrol with a partner during rush hour, when he noticed defendant and a woman, later identified as Deion Grinds, waiting for a train at the 42nd Street and Seventh Avenue subway station. When the train arrived, Sergeant Freyre, without his partner, boarded the train one car behind defendant and Ms. Grinds. Sergeant Freyre continued to follow the pair after they disembarked at 125th Street and Lenox Avenue station. Sergeant Freyre observed defendant and Ms. Grinds enter a Starbucks, attempt to make a purchase, and exit the Starbucks. Sergeant Freyre then observed them walk to a white Yukon SUV with a Louisiana license plate, which was parked three blocks away at 123rd Street and Seventh Avenue, and drive off. Sergeant Freyre testified that he did not arrest defendant on that day for the criminal possession of stolen property, because he had been unable to reach his partner and did not want to take police action alone. The following day, Sergeant Freyre returned to the same Starbucks and spoke to the cashier, who informed him that defendant had attempted to purchase an item with a credit card with another person's identification.

On November 16, 2012, Sergeant Freyre, who was in plain clothes in an unmarked police car, returned to 123rd Street and Seventh Avenue where he hoped to, and did in fact, find

---

**3.** It is unclear whether the People charged defendant with any offenses related to the MetroCard during the criminal proceeding stemming from the October incident.

**4.** The record is silent on whether the MetroCard in the surveillance video was the same as the one recovered from defendant during his October arrest.

the white Yukon SUV.[5] He called Officer Dones as backup. After Officer Dones arrived around 6:30 p.m., they surveilled the car for 45 minutes and then observed defendant and Ms. Grinds enter the car. The officers followed and observed them for approximately 100 city blocks: to a deli, which defendant entered and exited; then to a gas station at 145th Street, where defendant got gas; then on the highway, from which the car exited around 53rd Street; then to 55th Street between Third and Lexington Avenues, where defendant parked the car; and finally to a restaurant at 53rd Street and Third Avenue, which the pair entered.

Sergeant Freyre and Officer Dones stood outside the restaurant as defendant and Ms. Grinds ate. Sergeant Freyre contacted Lieutenant Callaghan and Sergeant Alfred Ricci and asked them to meet him and Officer Dones at the restaurant. When they arrived, Sergeant Freyre informed Sergeant Ricci and Lieutenant Callaghan that defendant was wanted for criminal possession of stolen property based on his possession of a MetroCard that had been bought with a stolen credit card. Sergeants Freyre and Ricci asked the restaurant's manager to inform them whether defendant used a credit card or cash to pay the bill; the manager told the police that defendant paid in cash.

The police then decided that they would arrest defendant when he returned to his car. Sergeant Ricci stood by defendant's parked car on East 55th Street, between Third and Lexington Avenues, while Officer Dones waited across the street. In the meantime, Sergeant Freyre and Lieutenant Callaghan watched defendant and Ms. Grinds walk from the restaurant toward the car, and notified the other officers of the pair's approach. None of the officers approached defendant or Ms. Grinds while they were in the restaurant or during their 2½-block walk to the car.

Sergeant Ricci observed that Ms. Grinds entered the front passenger door and that defendant opened the driver's door. As defendant was about to enter the car, Sergeant Ricci walked from the front of the car toward the opened driver's door and stood inside the open door with defendant. Sergeant Ricci testified that, at that point, he smelled marijuana "coming out of" defendant's car and immediately saw a single, unlit, partially smoked, marijuana cigarette in plain view in the center console between the front passenger seats. Sergeant Ricci testified that he promptly reached inside the car, picked up the marijuana

---

5. Sergeant Freyre testified that he never recorded the license plate of the SUV.

cigarette, and asked to whom it belonged. After defendant and his companion denied that the marijuana belonged to them, the police arrested defendant and Ms. Grinds. It was then around 11:00 p.m., approximately five hours after Sergeant Freyre had started following defendant.

After arresting defendant, Officer Dones searched him and found a wallet, inside which Officer Dones found two envelopes of heroin. Following Sergeant Ricci's direction, Officer Dones moved Ms. Grinds to the back of the car, and then searched her handbag, which was located on the front passenger seat. Officer Dones recovered approximately 20 to 30 store cards from her handbag. Sergeant Ricci testified that he looked through the windows and observed a large quantity of designer-named shopping bags, garments, and garment bags in the passenger rows, while Officer Dones testified that the shopping bags and merchandise were not visible from the outside of the car.

Sergeant Ricci drove defendant's car to the police base at Columbus Circle around 11:15 p.m., where the police "lodged" defendant and Ms. Grinds and began searching the car. Under Sergeant Ricci's supervision, Officer Dones took everything out of the car, and described the items to Officer Marcello, who handwrote a list on a lined notepad, noting the general location in the car where each item had been located. The two-page handwritten list is untitled and undated. Parts of the list are barely legible, but the legible portion states that the following items, among others, were recovered from the trunk: a black duffle bag, a black studio bag, a small black duffle bag with keys, a black Salvatore Ferragamo garment bag, a Macy's shopping bag, and a Coach shopping bag; from the front: five cell phones (in the center console), a cell phone charger, a brown wallet with a Louisiana ID, glasses, a Victoria's Secret bag, and a $350 gift card; from the "middle row": a Cole Haan garment bag, Cole Haan shopping bags with shoes, a black umbrella, three CDs, and a phone charger; and from the "3rd row": a silver Saks Fifth Avenue bag, a black jacket, a Burberry garment bag, a black bag with miscellaneous papers, a dry-cleaned shirt, a football, and DVDs.

In addition to the handwritten list, the police completed three property clerk invoices, which show a print date of November 17, 2012 and print times of 6:33 a.m., 6:08 a.m., and 5:59 a.m., respectively. The invoices list Officer Dones as both the invoicing and arresting officer. On the header of each invoice, it lists the "Property Category" field as "investigatory," and the "remarks" field of the invoice printed at 6:33 a.m. states that

"[T]he above is a complete list of items vouchered for investigatory purposes" (full capitalization omitted).[6]

The People bear the burden to establish that the police conducted a valid inventory search of defendant's car (*see People v Padilla*, 21 NY3d 268, 272 [2013], *cert denied* 571 US —, 134 S Ct 325 [2013]). "Following a lawful arrest of a driver of a vehicle that is required to be impounded, the police may conduct an inventory search of the vehicle" in order to catalog properly the contents of the vehicle (*id.*). The People must show that (1) the search was conducted pursuant to an established procedure "clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably" (*id.* [internal quotation marks omitted]); and (2) the officer's motive for conducting the search "must not be a ruse for a general rummaging in order to discover incriminating evidence" (*id.* [internal quotation marks omitted]). The People failed to meet their burden as to both elements.

The inventory list is the "hallmark of an inventory search" (*People v Johnson*, 1 NY3d 252, 256 [2003]). To determine whether an inventory list is valid and "usable," the courts have considered many factors, such as the length of time elapsed between the search and the listing of the property; what property, if any, was left in the car or returned to defendant; and whether the inventory list is "detailed and carefully recorded" (*People v Galak*, 80 NY2d 715, 720 [1993]). The NYPD Patrol Guide sets out two relevant procedures related to conducting a valid inventory search. The first procedure relates to the process of removing items from an impounded vehicle, which is outlined in a document titled "P.G. 218-13 Inventory Searches of Automobiles and Other Property" (search guideline). The second procedure relates to the process of creating an invoicing list, which is outlined in the "Invoicing Property (P.G. 218-01)."

Under the first procedure, the NYPD Patrol Guide's search guideline requires the police to do the following: (1) search the car's interior thoroughly; (2) force open a compartment, such as a trunk, only under certain conditions; and (3) remove all valuables from the vehicle, "voucher" the items on a form maintained by the NYPD entitled "PROPERTY CLERK INVOICE (PD 521-141)," leave "[p]roperty of little value" inside the car, and "within reason . . . list [it] in the uniformed member's

---

**6.** The "remarks" field for the invoice printed at 6:08 a.m. contains the same language, except it does not include the word "purposes." The "remarks" field for the invoice printed at 5:59 a.m. states that "all items being vouchered for investigatory" (full capitalization omitted).

ACTIVITY LOG (PD112-145) . . . cross referenced [sic] to the invoice number covering any valuables removed" (NYPD Patrol Guide Procedure No. 218.13 [3]).

In this case, the People failed to meet their initial burden to prove that the police acted in accordance with established procedures, because they failed to show that the police complied with the third requirement of the search guideline. Although the police testified that they removed "everything" from the car, the police did not create an activity log as required by this third requirement of the NYPD Patrol Guide. The People did not offer any evidence that the police cross-referenced property of little value with the invoice number of any valuable property removed. In addition, the handwritten list, which was not completed on an official form and did not comport with any of the established procedures, also included apparently valuable items, such as a "Salvatore Feragamo [sic]" garment bag, that do not appear on the property clerk invoices. Although the police testified that they removed property of little value, such as nail clippers, from the car, they also testified that they did not return anything to defendant, as required by the Patrol Guide.

Next, the search guideline lists the invoicing procedure as a related procedure. However, the People not only failed to submit a copy of the invoicing procedure into evidence at the suppression hearing, but also failed to elicit police testimony about the established procedure for invoicing items (*People v Gomez*, 50 AD3d 407, 409 [2008] [invalid inventory search where the People failed to establish content of any standardized procedure for inventory searches]). The only testimony relating to the invoicing of the items is Officer Done's testimony that he removed items out of the car while Marcello listed the items on a "large note pad, and whenever I grabbed the property, he would list." Because the People failed to produce the content of the invoicing procedure, the People failed to meet their initial burden of showing that the police acted according to established procedure.

Moreover, the People failed to establish that the inventory list met the standards. First, the property clerk invoices were not a detailed and accurate list of the items removed from defendant's car. For example, the handwritten list shows that five cell phones were recovered, while the property clerk invoice printed at 5:59 a.m. lists seven recovered cell phones. Second, neither the handwritten list nor the property clerk invoices state whether any property was left in the car and, if so, whether the items were returned to defendant (*People v Galak*,

80 NY2d at 720 [invalid inventory list where inventory form did not indicate whether items in the car were returned to the defendant and where the defendant did not sign a receipt for any items delivered to him]). Third, the print time on the property clerk invoices show that more than five hours had elapsed between the time when the police searched the car and when the invoice was printed. In *People v Galak*, as in this case, the inventory list was created five hours after the search. In that case, the Court concluded that the inventory list was invalid: "It is obvious that a list made so long after the search which does not indicate the disposition of each item removed is of little use either to the police or to citizens who find themselves disputing the whereabouts of an item or the accuracy of the record" (*id.*). Finally, the invoices plainly describe the property category as "investigatory" and indicate that the items recovered from defendant's car were "vouchered for investigatory" purposes (full capitalization omitted).

Even if the People had satisfied their initial burden of showing that the police complied with established procedure, the evidence adduced at the suppression hearing should be suppressed because the People failed to establish that the search was not a ruse for general rummaging in order to discover incriminating evidence. Although an inventory search may lead to incriminating evidence, that should not be its purpose (*People v Johnson*, 1 NY3d at 256). Here, the evidence suggests the contrary in three respects. Each police officer involved in the search testified that the search was "investigatory" and only added that the search's purpose was also for "inventory" as an afterthought. The majority ignores that each officer initially answered that the purpose of the search was investigatory. Specifically, Sergeant Ricci testified that, while looking at all the gift cards from Ms. Grind's handbag immediately after her arrest, he knew what "defendant was wanted for . . . put . . . two and two together, [and he] had a pretty good suspicion that the stuff in the car was stolen." Sergeant Ricci testified that "it was a search for evidence . . . because [they] found the drugs in the car," and that the items recovered from the car were vouchered as "investigatory evidence." He later added: "[A]nd also it was an inventory, inventory [sic]," and that the search was performed to "safeguard" defendant's possessions in his car while he was in custody, including "anything of value," and "to protect the officer[s] and the [police] department from any liability if the property does disappear." Similarly, Officer Dones testified initially that he "vouchered everything as investigatory evidence" but then later testified that the purpose of the search was to "safeguard" all property in defendant's car.

The police testimony that the search was investigatory is corroborated by several notations on the property clerk invoices, both in the "remark" section and in the "property category" field, stating that the evidence was vouchered for "investigatory" purposes (full capitalization omitted).

In addition, the officers' decision not to arrest defendant until he had opened the car door strongly suggests that the arrest was a pretext for searching the car. The officers had many prior opportunities to arrest defendant: as he approached the restaurant, while he was sitting in the restaurant, and during his two block walk to the car. Their decision not to arrest him until he had opened the car door provides strong circumstantial evidence that his arrest was merely a pretext for the officers to search the car for stolen property, which they were convinced they would find.

Moreover, the police testified that the initial criminal complaint stemming from defendant's arrest on November 16 did not charge defendant with criminal possession of stolen property. Instead, that complaint charged defendant with only two offenses: criminal possession of a controlled substance in the seventh degree and criminal possession of marijuana in the fifth degree.[7]

Consequently, even if some of the recovered items were not inculpatory, the abundant admissions that the items were recovered for investigatory or evidentiary purposes and the circumstances of the search demonstrate that the purported inventory search was "a ruse for a general rummaging in order to discover incriminating evidence" (*Padilla*, 21 NY3d at 272 [internal quotation marks omitted]).

Since the testimony showed that the police did not conduct a valid inventory search, the motion court should have considered whether the grounds for defendant's arrest justified the warrantless search of defendant's car under any other theory. Generally, a police search without a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions" (*Katz v United States*, 389 US 347, 357 [1967]). In *Arizona v Gant*, the Supreme Court held that the police have the authority to search incident to an occupant's recent arrest, under the automobile exception, only (1) when the arrestee is "unsecured and within reaching distance of the passenger compartment at the time of the search"; or (2) when

---

7. According to the transcript from the suppression hearing, the criminal court complaint stemming from defendant's November 16 arrest was submitted into evidence and marked as defendant's exhibit D. However, that exhibit is not part of the record submitted to this Court.

the police have reason to believe that "evidence relevant to the crime of arrest might be found in the vehicle" (556 US 332, 343 [2009] [internal quotation marks omitted]). The scope of a valid warrantless automobile search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found" (*California v Acevedo*, 500 US 565, 579-580 [1991], quoting *United States v Ross*, 456 US 798, 824 [1982]). Absent "a substantial likelihood of a weapon being present in the vehicle which . . . poses an actual and specific danger to the officer's safety," it is unlawful for an officer "to invade the interior of a stopped car" without probable cause (*People v Newman*, 96 AD3d 34, 41-42 [1st Dept 2012] [internal quotation marks omitted], *lv denied* 19 NY3d 999 [2012]). In determining "whether an officer has the requisite 'reasonable suspicion' to intrude into a stopped vehicle whose occupants have been removed and frisked, '[t]he court's focus must center on whether the police conduct was reasonable in view of the totality of the circumstances, for reasonableness is the touchstone by which police-citizen encounters are measured' " (*id.* at 42, quoting *People v Anderson*, 17 AD3d 166, 167-168 [2005] [citations omitted]).

Here, the motion court found that the police had grounds to arrest defendant for (1) possession of marijuana, based on the smell and recovery of the partial marijuana cigarette in defendant's car; (2) possession of stolen property, based on defendant's possession of a MetroCard bought with a stolen credit card; and (3) identity theft, based on defendant's attempt to purchase an item at Starbucks using a credit card that did not belong to him.[8] As to the first ground of arrest based on the marijuana, the police search of defendant's entire car was unreasonable, because they immediately found the marijuana cigarette and had no reason to believe that marijuana would be present in the rest of the car. The police testified that they smelled burnt marijuana emanating from defendant's car, but this case is distinguishable from others in which such an observation warranted a search of the car (*see e.g. People v Badger*, 52 AD3d 231, 232 [1st Dept 2008], *lv denied* 10 NY3d 955 [2008]); here, the police immediately saw a partially smoked marijuana cigarette in the ashtray in the center console. Under the circumstances, "the police did not have probable cause to believe that [marijuana] was hidden in any other part of the automobile," rendering the "search of the entire vehicle . . . unreasonable under the Fourth Amend-

8. The record does not include an arrest or charge sheet stemming from defendant's November arrest.

ment" (*California v Acevedo*, 500 US at 580; *compare People v Yancy*, 86 NY2d 239, 246 [1995] [searches of cars were justified by officers' observations, including of a large number of empty vials in plain view in the cars, "allow[ing] them to surmise that defendants possessed a large quantity of empty vials for something other than personal use"]).

Likewise, the other two grounds for which defendant was arrested provided no reasonable basis for the police to search defendant's car. First, defendant's possession of a subway MetroCard purchased using a stolen credit card, did not constitute criminal possession of stolen property, and thus could not support an arrest for that offense.[9] Second, a warrantless car search based on defendant's use of another's credit card at Starbucks was unlawful, because police testimony failed to establish that the police had reason to believe that evidence of identity theft related to the Starbucks incident might be found in the car. Although the police may have had probable cause to believe that the car contained evidence of other property crimes, any other such crimes are immaterial under *Gant*, which authorizes a warrantless search of an automobile incident to an arrest only "when it is reasonable to believe that evidence of *the offense of arrest* might be found in the vehicle" (556 US at 335 [emphasis added]). Thus, the police had no reasonable justification to search defendant's car.

Because the People failed to show that the police had conducted a valid inventory search and because there was no reasonable basis to conduct a warrantless search of defendant's car incident to his arrest, the motion court should have granted defendant's motion to suppress the physical evidence recovered during a search of his car.

---

**9.** The majority did not reach the issue of whether the police had probable cause to arrest defendant based on his possession of the MetroCard.